Graham C. GARNER and Sydney Morris, as Official Liquidators of the British-American Bank, Ltd., a Bahamian Banking Company (in compulsory liquidation), Plaintiffs,

v.

FIRST NATIONAL CITY BANK,
Defendant.

No. 73 Civ. 3327 (VLB).

United States District Court,
S. D. New York.

Jan. 11, 1979.

Kronish, Lieb, Shainswit, Weiner & Hell-
man, New York City, for plaintiffs.

Shearman & Sterling, New York City, for
defendant.

OPINION

VINCENT L. BRODERICK, District
Judge.

I

*Introduction*

This is an action brought by the Official
Liquidators of the British American Bank,

Ltd. ("B.A. Bank"), a Bahamian banking company now in compulsory liquidation, against First National City Bank ("Citibank"), a national banking association with its principal place of business in New York City.

This court has jurisdiction of this action under 28 U.S.C. § 1332(a). Plaintiffs are citizens of a foreign country; defendant is a citizen of the State of New York; and the amount in controversy, exclusive of interest and costs, exceeds $10,000.

Plaintiffs seek in this action (1) to recover damages for the alleged conversion of 86,874 shares of the common stock of the American National Bank and Trust Company of South Pasadena, Florida ("American Bank"), or (2) to impose a constructive trust on the allegedly converted stock or the stock's proceeds for the benefit of the B.A. Bank.

Plaintiffs allege that, as part of a conspiracy to divest the B.A. Bank and its subsidiaries of the bulk of their assets, certain control persons of the the B.A. Bank and its subsidiaries converted the American Bank stock from the B.A. Bank. Plaintiffs further allege that the converted American Bank stock was later purchased by Citibank as pledgee in a purchase money loan transaction. They assert that Citibank took no greater rights in the American Bank stock than those rights that the original converters of said stock had had.

Citibank's principal counter to plaintiffs' contentions is that Citibank was a *bona fide* purchaser ("BFP") of the pledged stock and that, therefore, Citibank acquired the stock free of any adverse claim. Plaintiffs deny that Citibank was a BFP and contend (1) that Citibank had actual and constructive notice of B.A. Bank's claim to the American Bank stock at the time Citibank purchased the pledged stock, and (2) that, at least, Citibank purchased the stock under circumstances that established that the purchase was made in bad faith.

A bench trial was had herein. This opinion, which is based on the facts stipulated in the Pre-Trial Order, the evidence adduced at trial, and reasonable inferences drawn from such facts and evidence, contains my findings of facts and conclusions of law under Rule 52(a), Fed.R.Civ.P.

## II

### Facts

#### A. The Various Corporate Entities

1. *The B.A. Bank.* The B.A. Bank was incorporated under the laws of the Bahamas and was engaged in the business of banking from July 19, 1966 until February 4, 1972.

At all times between its incorporation in 1966 and at least until October 25, 1971 the B.A. Bank was controlled, managed, and operated by Robert N. Bussey, Tazwell W. Pearson, and Donald R. Baker. By January, 1971, the B.A. Bank's liabilities exceeded its assets. However, the B.A. Bank's financial statements as of February 28, 1971 failed to reflect this insolvency.

On February 4, 1972 the B.A. Bank's license was suspended by the Bahamas Ministry of Finance. On May 4, 1972 the B.A. Bank's license was revoked by the Ministry. On May 11, 1972, the Bahamas Supreme Court placed the B.A. Bank in provisional liquidation. On June 5, 1972 the Bahamas Supreme Court placed the B.A. Bank in involuntary liquidation and appointed Bernard Gadd as official liquidator. On March 30, 1973 plaintiffs Graham C. Garner and Sydney Morris were duly appointed to succeed Gadd as the official liquidators of the B.A. Bank.[1]

2. *British American Bancorporation, Inc.* About November 21, 1968, the British American Bancorporation, Inc. ("Bancorp") was incorporated under the laws of Florida. Bancorp's principal place of business was in a suite of offices occupied by Bussey in St. Petersburg, Florida. From November, 1968 until August 15, 1969, Bancorp was a wholly owned subsidiary of the B.A. Bank.

---

1. Under the laws of the Bahamas, the Bahamas Supreme Court has jurisdiction over the liquidation and winding up of the affairs of the B.A. Bank.

From November, 1968 until it was involuntarily dissolved in 1974, Bancorp was controlled, managed, and operated by Bussey, Pearson, and Baker.

3. *British American Investment Fund, S.A.* About April 4, 1969, the B.A. Bank caused the British American Investment Fund, S.A. ("the Fund") to be incorporated under the laws of Luxembourg. At all relevant times, the Fund was controlled, managed and operated by Bussey, Pearson and Baker. Moreover, at all relevant times, the B.A. Bank owned between 75% and 97% of the issued and outstanding shares of the Fund.

On August 15, 1969, Bancorp became a Fund subsidiary when the B.A. Bank transferred its 100% stock interest in Bancorp to the Fund in return for a note. The note was satisfied in November, 1969 by the issuance of 139,114 Fund shares to the B.A. Bank.

4. *American Bank.* Between April 1, 1969 and December 31, 1969, the B.A. Bank paid $1,472,519 for 75,895 common shares of the American Bank, representing 73% of the American Bank's outstanding common stock. Bussey, Pearson and Baker caused all of that stock to be registered in the name of Bancorp, which was the United

States component of the B.A. Bank—Bancorp—Fund complex.

At all times between April 30, 1969 and April, 1972 the American Bank was controlled, managed and operated by Bussey, Pearson and Baker.

### B. *Bussey, Pearson and Baker Convert American Bank's Stock*

By means of a series of complicated transactions while they controlled B.A. Bank, Bancorp, the Fund and the American Bank, Bussey, Pearson and Baker obtained 82,774 shares, or 80%, of the then outstanding American Bank common stock, leaving Bancorp with only 6,600 shares (or 5½%) of the American Bank stock. The B.A. Bank—Bancorp—Fund complex received nothing of value in return for the 82,774 shares of the common stock of American Bank.[2]

Between February, 1971 and October 25, 1971, by means of yet another series of transactions, Bussey *et al.* obtained virtually all of the rest of the B.A. Bank's non-Bahamian assets and left the B.A. Bank with only an unsecured long-term debt from the Fund.

---

**2.** Thus in December, 1970 Bussey *et al.* caused the American Bank to issue 14,000 new shares. They purported to purchase 13,479 of those new shares (in violation of Bancorp's preemptive rights to 10,220 of the shares). The purchase price ($202,850) was paid by B.A. Bank.

On February 5 or 8, 1971, Bussey purported to purchase 50,940 shares of American Bank stock from Bancorp in exchange for an unsecured debt of $734,193 (or $14.41 per share). Baker purported to purchase 5,660 shares of American Bank stock from B.A. Bancorp for an unsecured debt of $67,920. Then, on February 8, 1971, Bussey purported to sell 28,500 shares of B.A. Bank stock to the Fund in exchange for $1,222,428 (or $42.96 per share), payable by, *inter alia*: (1), the Fund's assumption of Bussey's obligation to pay $734,193 to Bancorp, which had been incurred in exchange for the 50,940 shares of American Bank stock; and (2) a cash payment of about $400,000. Bussey's February 8, 1971 purported transfer of B.A. Bank shares to the Fund was illegal and of no effect under Bahamian law, and Bussey remained the holder of record of those B.A. Bank shares despite the purported transfers.

Plaintiffs have presented claims against Bussey *et al.* in a suit now pending in the U. S. District Court for the Middle District of Florida, *Garner, et ano. v. Pearson, et al.*, No. 72–416–Civ. T.K. (the "Tampa Action"). Citibank is not a defendant in the Tampa Action, and plaintiffs do not allege that Citibank was a member of the conspiracy that was contrived by Bussey *et al.*

The facts regarding the conduct of Bussey *et al.* are, of course, in dispute in the Tampa Action. However, solely for the purposes of this action, Citibank has admitted and stipulated to the facts with respect to the activities of Bussey *et al.* Therefore, the only issue herein regarding the conduct of Bussey *et al.* is a legal issue, to wit: What is the proper legal characterization of that conduct?

A question with respect to the value of the "consideration" that Bussey exchanged for the American Bank stock may well be in issue in the Tampa Action. However, the point is not in issue here because the parties have expressly stipulated that "nothing of value" passed between Bussey *et al.* and the B.A. complex.

### C. The "Sale" of B.A. Bank

On October 25, 1971, Pearson sold 100% of the B.A. Bank stock to Dr. Federico Cruz and Thor Brunskow for $3.8 million, which Cruz purportedly borrowed on that day from the B.A. Bank in an unsecured loan approved by the B.A. Bank board of directors. This purported sale of the B.A. Bank originally received conditional approval by the Bahamian authorities. However, on November 16, 1971, the conditional approval was rescinded *ab initio,* and the sale transaction was rendered null and void under Bahamian law.[3]

### D. The Citibank Loan and Matters Pertaining Thereto

In September 1971, William E. Bassett was hired as executive vice president of the American Bank at an annual salary of $21,000, and E. Wayne Johnson was hired as vice president at an annual salary of $13,000. Bassett and Johnson were each given (and each later exercised) options on 1,000 shares of American Bank stock at $38 and $45 per share, respectively.[4]

On October 14, 1971, Bussey pledged 59,260 shares of American Bank stock to the Exchange National Bank of Tampa, Florida ("Exchange") as security for a $925,000 loan. Thereafter, he pledged an additional 10,920 shares of American Bank stock as further security for that loan and as security for an additional loan of $150,000. The American Bank share certificates that Bussey pledged had been registered in his name, and his purported ownership of those shares was reflected on the stock transfer records of American Bank, which bank was, as mentioned above, under the control of Bussey *et al.*

Beginning in November, 1971, defendant Citibank investigated the B.A. Bank and Dr. Cruz because a Citibank customer, Flagler Systems, Inc. ("Flagler"), wanted to sell property to Dr. Cruz in a transaction that was to include a $5,000,000 guaranty by B.A. Bank. The proposed sale required Citibank's approval under the security arrangements between Citibank and Flagler.

The duration of the Flagler investigation and the extent of the involvement of the relevant personnel at Citibank in that investigation are not precisely clear. One of Citibank's witnesses, Andrew Toxey, who was an officer involved in arranging the loan/pledge transaction at issue herein, testified that the investigation was over and the matter forgotten by November 22, 1971. And, indeed, that may be so.

However, Citibank was conducting another investigation of the B.A. Bank during November, 1971 with respect to a B.A. Bank request to establish banking and credit relationships with Citibank in New York. In connection with this investigation, a Citibank officer, Wasson, had a business luncheon with a B.A. Bank officer, Davies, on November 22, 1971. Wasson invited Toxey to that luncheon, and Toxey attended. In preparation for this business meeting, Wasson had obtained from another Citibank employee, Albury, an October 31, 1971 financial statement of B.A. Bank, which statement listed among B.A. Bank's assets a two million dollar investment in the American Bank. Either before or after the November 22 meeting, Wasson delivered to Toxey for his examination a copy of that B.A. Bank financial statement. At the luncheon Davies told Wasson and Toxey that among the assets of B.A. Bank was an investment in the American Bank.

On February 28, 1972, the *Wall Street Journal* reported that the B.A. Bank claimed that, according to its records, it owned the American Bank. This newspaper article appeared a little more than a month before Citibank accepted the pledge

---

**3.** Under Bahamian law, unconditional approvals were prerequisite to the validity of the stock transfer. The grounds for the rescission were that both Bahamian law and the B.A. Bank's Articles of Association prohibited the B.A. Bank from financing the purchase of its own shares.

**4.** Their exercise of these options reduced the number of American Bank shares that were held by B.A. Bancorp from 6,600 to 4,600.

in issue here. The *Wall Street Journal* article was read by Bassett, Johnson, and Toxey.[5]

On March 1, 1972, R. M. Stevenson, the Vice President of the Federal Reserve Bank in Atlanta, wrote to Bussey at the American Bank. In his letter, Stevenson referred to the February 28th *Wall Street Journal* article as one basis for questions as to the ownership of the American Bank.

In March of 1972, the *St. Petersburg Times* reported that Bussey and Pearson had denied Cruz's public claims of B.A. Bank ownership of American Bank. This denial had taken place at a press conference that had been arranged by and attended by Bassett.

On or about March 13, 1972, Bussey extended to Bassett and Johnson an option to purchase 90,213 shares (76.5%) of the common stock of the American Bank ("the March 13 option"). The March 13 option, which was to expire on April 4, 1972, was executed by Bussey on his own behalf (68,-680 shares) and as purported agent for Baker (8,309 shares), Pearson (7,537 shares), Bancorp (4,100 shares), and Britton Holding Company (1,587 shares).[6]

On or about March 14, 1972, Bassett and Johnson were promoted to president and executive vice president of the American Bank at respective annual salaries of $30,-000 and $25,000.

On March 29, 1972 Robert Bruce, then executive vice president of Southeast Banking Corporation ("Southeast"), a Florida bank holding company, called William Harvey ("Harvey"), an officer at Citibank. Bruce told Harvey that Southeast was interested in acquiring the American Bank

stock from Bassett and Johnson, and asked Citibank to assist in the acquisition by lending Bassett and Johnson $2 million to purchase the stock from Bussey pending governmental approval of the acquisition by Southeast.[7] The proposed Citibank loan was to be secured by a pledge of American Bank stock, which stock was to be replaced with a substantial amount of Southeast stock after Southeast had acquired from Bassett and Johnson their American Bank stock pursuant to an option agreement. (Regarding that option agreement, see *infra*.) Bruce assured Harvey that since Citibank did not know Bassett or Johnson, Southeast would stand behind the loan to Bassett and Johnson and would agree to "take Citibank out" if necessary. Bruce stated that Southeast would not commit itself to this undertaking in writing, but he arranged to have Southeast's chairman, at whose request he was calling, confirm the arrangement by telephone with Toxey.[8]

Based upon his March 29, 1972 conversation with Bruce, Harvey instructed Toxey to "pull the deal together, to contact the prospective borrowers and to document the loan properly." To that point, neither Harvey nor Toxey had ever met Bassett or Johnson.

On March 30, 1972, Bassett and Johnson came to New York and met with Harvey and Toxey at a luncheon. During this meeting the details of the loan that Citibank was to make to Bassett and Johnson were agreed upon. The only discussion regarding title to the American Bank stock that Bassett and Johnson were going to buy concerned possible dower rights of Bussey's wife. There was no discussion regarding Bussey's authority to act as agent for his

**5.** On March 24, 1972, the *Wall Street Journal* published a follow-up article, which reported an inconclusive interview with unidentified Citibank sources regarding the affairs of the B.A. Bank, which bank had been a customer of Citibank's Nassau Branch. A copy of this article was in the B.A. Bank credit file in Citibank's New York head office; however, the record is inconclusive as to whether any of the relevant Citibank personnel saw the March 24th article at any time that is relevant in relation to this case.

**6.** Britton Holding Company was a corporation owned entirely by Bussey and Baker.

**7.** Southeast was the largest and most important bank holding company in the area serviced by Citibank's Corporate Banking Group Division VI ("CBG"). Harvey and Toxey were employed in CBG.

**8.** Southeast's chairman did give such confirmation after the loan had been made.

purported principals under the March 13 option agreement. Also, Harvey and Toxey did not discuss with Bassett and Johnson the reasons for Southeast's interest in the American Bank stock, why the stock was available for sale, or the price that Southeast might have to pay Bassett and Johnson for such stock.

At the March 30, 1972 meeting, Bassett and Johnson delivered 12,696 shares of American Bank stock (1,587 shares in the name of Britton Holding Co., 4,100 shares in the name of Bancorp, 6,809 shares in the name of Baker, and 200 shares in the name of Bassett). Bassett and Johnson were asked to and did, either at the March 30, 1972 meeting or shortly thereafter, sign a promissory note and hypothecation agreements. They also provided financial statements, a Regulation U purpose statement, and other documents required for the loan.

On or about March 31, 1972, Bassett and Johnson entered into an option agreement with Southeast under which Southeast received the right to acquire such shares of the common stock of American Bank as might be acquired by Bassett and Johnson from Bussey and his purported principals under the March 13 option. Southeast's option was to operate on an exchange of shares basis, to wit, .61 shares of Southeast common stock for each American Bank share owned by Bassett and Johnson at the date Southeast exercised the option. Southeast was familiar with the March 13 option to Bassett and Johnson, and Southeast knew that the option was to expire on April 4, 1972.

Also on March 31, 1972, a Citibank commitment letter with respect to the $2 million loan was sent to Bassett and Johnson in Florida. It was anticipated that the loan would be repaid out of the proceeds of the sale of Southeast stock, which was to be received by Citibank in exchange for the pledged shares of American Bank stock. However, Bassett and Johnson remained personally liable on the loan.

On or about April 3, 1972, an additional 77,517 shares were received by Citibank from Exchange. Thus by April 3, 1972, Citibank had received a total of 90,213 shares of American Bank stock. Accompanying the shares from Exchange was a letter dated March 31, 1972 and a draft on Citibank in the amount of $1,045,245.85. Citibank received, with respect to the 90,213 shares of American Bank stock delivered to Citibank by Bassett and Johnson and Exchange, blank stock powers signed by the owners specified in the share certificates received and blank stock powers signed by Bassett and Johnson.[9]

Also on April 3, 1972, Toxey prepared a "facility memorandum" that provided Citibank's internal authorization for the loan. He and Harvey signed it. The required third signature was obtained from one Timothy Rogers, who had no knowledge of the terms or details of the loan.

On the same day, April 3, 1972, Citibank disbursed the loan. About $754,000 was wired to the American Bank for Bassett and Johnson, and about $1,045,000 was sent to Exchange. Part of the latter sum was used to retire Bussey's loan at Exchange.

No credit check on Bassett and Johnson had been performed. The loan would not have been made but for the verbal guarantee of the loan by Southeast's officers.

Bassett and Johnson paid Bussey and his purported principals approximately $1.8 million in cash and $674,336 in unsecured notes for the American Bank stock. Bancorp received no cash for its 4,100 shares of American Bank stock. On April 4, 1972 Bassett and Johnson informed the Regional Administrator of National Banks in Atlanta that they had bought 90,213 shares of American Bank stock.

On or about May 26, 1972 Southeast notified Bassett and Johnson that it intended to exercise its option to exchange Southeast stock for American Bank stock.

---

9. Citibank did not purchase from Exchange either Bussey's loan at Exchange or the stock pledged to secure that loan.

In August, 1973 Southeast delivered 110,060 shares of Southeast stock to Citibank in exchange for the 90,213 shares of American Bank stock that Citibank had received in pledge.[10] During August, 1973 the 110,060 shares of Southeast stock had a market value that ranged between $3,549,435 and $3,824,585. Citibank has since sold some of the Southeast stock pursuant to Citibank's loan agreement with Bassett and Johnson.

Citibank did not attempt to deal with, or in any way communicate with, Bussey, Pearson, or Baker in connection with any of the transactions relevant to this suit.

On or about March 26, 1972, Bussey took up residence in Argentina. He thereafter renounced his U.S. citizenship and became a citizen of Argentina and a resident of Costa Rica.

## III

### Liability

A. *Bussey et al. Converted the American Bank Stock From the B.A. Bank, the Stock's Beneficial Owner*

■ The B.A. Bank was the beneficial owner of the American Bank stock at the time Bussey *et al.* appropriated that stock for their own purposes. The conduct of Bussey *et al.* constituted a conversion under either the law of New York or the law of the Bahamas.

The consideration for the American Bank stock came from the B.A. Bank, and the B.A. Bank was the parent entity in the B.A. Bank—Bancorp—Fund complex. The shifting of the American Bank stock throughout the complex by Bussey *et al.*, who effectively controlled not only the complex but also the American Bank, did not affect the B.A. Bank's ownership rights in the stock. Although Bussey *et al.* were fiduciaries of the B.A. Bank, they "purchased" this stock from the B.A. Bank—Bancorp—Fund complex for themselves with B.A. Bank funds. The fact that they manufactured, and made a matter of record, various paper obligations running from themselves to the B.A. Bank did not transform the conversion into a contractual relationship.

In *Gerdes v. Reynolds*, 30 N.Y.S.2d 755 (Sup.Ct.N.Y.Co.1941), in the context of facts similar to those obtaining herein, the court stated that the manufacture of a documentary "cover" for a tortious conversion did not legitimate the act:

> The circumstance that to cloak their illegal purpose of looting the company, there was procured, in exchange for the securities thus taken from the company's portfolio, a credit in favor of the company on the books of Prentice & Brady which was intended to be, and shortly was, used as the vehicle for abstracting $882,500 from the funds of the company, cannot purge their act of the character stamped upon it ab initio by their unlawful purpose—that of a tortious conversion.

*Id.* at 762.

■ Under New York law a corporate officer who applies corporate funds to purposes beyond the scope of his authority converts them:

> There can be no doubt that a corporate officer who applies the funds of a corporation to purposes beyond the scope of his authority is guilty of conversion of the corporate funds, . . . There can also be no doubt that a corporate officer has no power, implied or apparent, to apply corporate funds to the discharge of his personal indebtedness. These rules have been enunciated so frequently, and are so fundamental in the law governing corporate rights and powers, that citation is unnecessary.

*Quintal v. Kellner*, 264 N.Y. 32, 35, 189 N.E. 770, 771 (1934) (dictum).

---

10. Southeast has taken control of the American Bank and has discharged Bassett and Johnson.

The ratio of the Southeast and American Bank shares that were exchanged in August of 1973 was not in accordance with the ratio that had been agreed upon between Southeast and Bassett and Johnson in their option agreement of March 31, 1972. *See* p. 379 *supra*. The discrepancy in the ratios apparently resulted from alterations in Southeast's outstanding stock. In any event, there is no issue in this case with respect to this discrepancy.

Bussey applied monies of the Fund to discharge his personal indebtedness in the transaction of February 5–8, 1971, which transaction has been recounted in footnote 2. The gist of that transaction was that Bussey used the funds of the Fund to discharge his personal indebtedness to Bancorp, which liability he had incurred by his "purchase" of more than 50,000 shares of American Bank stock. The transactions participated in by Bussey *et al.*, whereby Bussey *et al.* appropriated virtually all of the B.A. Bank's non-Bahamian assets, were of a similar character; a major aspect of those transactions was also the application of corporate funds to discharge the personal indebtedness of Bussey *et al.* Thus under the New York standard stated in *Quintal, supra,* the conduct of Bussey *et al.* constituted a conversion. *See also Gerdes v. Reynolds, supra; Upson v. Otis,* 155 F.2d 606, 610–11 (2d Cir. 1946) (applying Delaware substantive law but noting that, under New York substantive law, directors may be held liable for conversion upon a breach of fiduciary duty).

I also find on the basis of the trial testimony of Ralph Seligman, Esq., plaintiff's expert on Bahamian law, that the conduct of Bussey *et al.* constituted a conversion under the law of the Bahamas.

### B. *The Status of the Purchasers Who Succeeded Bussey et al.*

#### 1. *Bassett and Johnson*

 Bassett and Johnson, who purchased the stock from Bussey *et al.*, were "purchasers" within the meaning of the applicable law, the Uniform Commercial Code. Fla. Stat.Ann. §§ 671.1–201(32); 671.1–201(33) (West 1966); N.Y.U.C.C. §§ 1–201(32); 1–201(33) (McKinney 1964). Thus their status vis-a-vis the American Bank stock is to be assessed on the basis of the principles enunciated in Article 8 of the Code.

The relevant provisions of the Code are §§ 8–301 and 8–302. Section 8–301 provides in pertinent part:

§ 8–301. Rights Acquired by Purchaser; "Adverse Claim"; Title Acquired by Bona Fide Purchaser

(1) Upon delivery of a security the purchaser *acquires the rights in the security which his transferor had or had actual authority to convey* except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser. *"Adverse claim" includes a claim* that a transfer was or would be wrongful or *that a particular adverse person is the owner of or has an interest in the security.*

(2) *A bona fide purchaser in addition to acquiring the rights of a purchaser also acquires the security free of any adverse claim.*

Fla.Stat.Ann. § 678.8–301; N.Y.U.C.C. § 8–301 (emphasis added).

The term "bona fide purchaser" as used in § 8–301 is defined in § 8–302 as follows:

§ 8–302. "Bona Fide Purchaser"

A "bona fide purchaser" is a purchaser for value in good faith and *without notice of any adverse claim* who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank.

Fla.Stat.Ann. § 678.8–302; N.Y.U.C.C. § 8–302 (emphasis added).

Under the applicable law, then, Bassett and Johnson acquired only the rights in the American Bank stock that the converters Bussey *et al.* had had unless Bassett and Johnson were BFP's of that stock. Further, Bassett and Johnson were not BFP's of the stock if they had notice of the B.A. Bank claim to the American Bank stock.

Bassett and Johnson read the February 28, 1971 *Wall Street Journal* article, and they found the article sufficiently clear to give them "concern." Bassett arranged and attended a press conference at which Bussey denied B.A. Bank's adverse claims to the American Bank stock. I find that Bassett and Johnson had notice of B.A. Bank's adverse claim. *See* Fla.Stat.Ann. § 678.8–304; Uniform Commercial Code Comment to Section 8–304 (Section 8–304's

listing of situations involving notice is not exhaustive "and does not exclude other situations in which the trier of the facts may determine that similar notice has been given."). *Cf.* N.Y.U.C.C. § 8–304(3) (if purchaser has knowledge of adverse claim, purchaser has notice of the claim). Hence Bassett and Johnson were not BFP's, and they acquired only the rights in the American Bank stock that Bussey *et al.* had had.[11]

### 2. *Citibank*[12]

■ Under the Code, Citibank, which as a pledgee was a purchaser, N.Y.U.C.C. §§ 1–201(32); 1–201(33), acquired the same rights that Bassett and Johnson had had in the stock, which rights were only those that Bussey *et al.* had had. Citibank was not a BFP because Citibank's "action in taking the security amount[ed] to bad faith" under N.Y.U.C.C. § 8–304(3), which provides that:

§ 8–304. Notice to Purchaser of Adverse Claims.

\* \* \* \* \* \*

(3) Except as provided in this section, *to constitute notice of an adverse claim* or a defense, *the purchaser must have* knowledge of the claim or defense or

*knowledge of such facts that his action in taking the security amounts to bad faith. Id.,* § 8–304(3) (emphasis added).[13]

The test for what constitutes "bad faith" under N.Y.U.C.C. § 8–304(3) has recently been stated by the Second Circuit in a diversity case in which the court applied New York law. *Gutenkunst v. Continental Insurance Co.,* 486 F.2d 194 (2d Cir. 1973). In *Gutenkunst,* the only issue was "whether [defendant] enjoyed the status of a bona fide purchaser under §§ 8–301 to 8–304 of the New York Uniform Commercial Code, so as to cut off the rights of [plaintiff], the 'true' owner." *Id.* at 195. On this issue the court set forth as New York law "that only actual knowledge or *disregard of suspicious circumstances may constitute evidence of bad faith." Id.* at 195–96 (emphasis added). On the basis of that test, the court affirmed a judgment for defendant largely on the grounds that plaintiff conceded that defendant "did not know any facts which should have aroused its suspicion." *Id.* at 196.[14]

Application of the *Gutenkunst* test in this case produces a different result than that reached in *Gutenkunst* itself. Here there was such disregard of suspicious circumstances on the part of defendant as to con-

11. It seems preferable to say that Bassett and Johnson acquired only the rights of Bussey *et al.* rather than to say, as plaintiffs argue, that Bassett and Johnson are converters. The reason for this preference is that the former form of expression tracks the language of the governing statute, § 8–301(1), and that the latter form of expression may be unduly prejudicial to the party thus referred to. *See supra* p. 384; *infra* n.18.

12. In regard to the issue of the status of Citibank, defendant has submitted an Application for Judicial Notice with regard to the facts set forth in the New York State Banking Department Financial Studies Division *Report of Special Investigation of Lending To Banker-Borrowers by New York State-Chartered Banks* and the facts set forth in a December 22, 1977 letter from Robert P. Forrestel, Senior Vice President and General Counsel of the Federal Reserve· Bank of Atlanta, to Henry Harfield, Esq.
 I take judicial notice of the facts contained in the *Report* and the facts contained in the letter. *See* Rule 201(d), (f), Fed.R.Evid.

I note, however, that the information supplied, *see id.,* Rule 201(d), is incompetent as evidence as to Toxey's or Harvey's knowledge in 1972 and is not admitted into evidence on that issue. I note also that the facts of which I take judicial notice are not inconsistent with the particular facts that I find in the text, *infra,* with regard to Citibank's status.

13. Because I find the conclusion that Citibank's action amounted to bad faith sufficient to dispose of the issue of liability in this case, I do not reach plaintiffs' arguments as to actual and constructive notice. *See Otten v. Marasco,* 353 F.2d 563, 565 (2d Cir. 1965).

14. The *Gutenkunst* test of "disregard of suspicious circumstances" is similar to the test employed by the Second Circuit in an earlier case, *Otten v. Marasco,* 353 F.2d 563, 565–566 (2d Cir. 1965) (applying New York law), wherein the court held that "willful ignorance" of facts could constitute bad faith under the predecessor statute to N.Y.U.C.C. § 8–304(3). On the facts in *Otten,* the court concluded that defendant's failure to inquire "constituted 'willful ignorance' and therefore bad faith." *Id.* at 566.

stitute "bad faith" within the meaning of N.Y.U.C.C. § 8–304(3). On the basis of this bad faith I find as a matter of law that defendant had notice of B.A. Bank's adverse claim to the American stock. N.Y.U.C.C. § 8–304(3).

Principal among the suspicious circumstances disregarded by defendant were the circumstances involving evidence of a possible adverse claim by B.A. Bank to the American Bank stock. In November, 1971, defendant's agent Toxey was presented with evidence of B.A. Bank's investment in American Bank via in person communication from Davies, a B.A. Bank officer, and via the B.A. Bank financial statement. Then, in February or March of 1972, Toxey was again presented with evidence of that investment via the February 28, 1972 *Wall Street Journal* article. Thus defendant knew "facts which should have aroused its suspicion." *Gutenkunst, supra,* 486 F.2d at 196. Only Citibank's "disregard of suspicious circumstances," *id.* at 195, permitted Citibank to go forward with the loan/pledge transaction without making an inquiry as to the question of who owned the collateral.[15]

There were other suspicious circumstances. There was the circumstance that Bassett and Johnson, who only recently had been hired by Bussey for the American Bank at salaries of $21,000 and $13,000, respectively, were certainly not creditworthy for a two million dollar loan. (As has been noted, that loan would not have been made but for the oral guarantee afforded Citibank by Southeast). Another suspicious circumstance disregarded by defendant is the fact that Bancorp, which was a bank holding company, owned, at the time of the pledge transaction, only 4,100 of the more than 100,000 outstanding American Bank shares. Another circumstance that should have led to inquiry was the fact that Bussey, as a purported agent, was offering third parties' securities with stock powers as collateral for the loan to Bassett and Johnson.[16]

Given these suspicious circumstances, I find that a further indication of bad faith is Citibank's failure to investigate the relationship between Bassett and Johnson, officers of the American Bank, and Bussey, the chief stockholder in the American Bank, and the relationship between Bassett and Johnson and Southeast.

 Citibank had notice of the adverse claim, N.Y.U.C.C. § 8–304(3), and was not a BFP. N.Y.U.C.C. § 8–303. Thus Citibank acquired only the rights that its transferors, Bassett and Johnson, and their transferors, Bussey *et al.,* had had in the American Bank stock. N.Y.U.C.C. § 8–301(1). Accordingly, Citibank is liable to plaintiffs for the return of that stock or for some appropriate sum of damages in lieu thereof. *See Otten v. Marasco, supra,* 353 F.2d at 564–66.[17]

15. Significant in this regard is the fact that Wasson sent Toxey a copy of Wasson's January, 1972 memorandum, in which Wasson stated that the B.A. Bank was in trouble financially. This memorandum, which Toxey must have glanced at, even if only fleetingly, would have sufficed to keep the B.A. Bank problem in Toxey's mind during the November, 1971 to February/March, 1972 period. This fact supports the finding that Toxey read the February 28, 1972 *Wall Street Journal* article and suggests that he read the article carefully rather than merely skimming it.

I do not find it necessary to hold that what Toxey had learned about the adverse claim of B.A. Bank was sufficient to give him "knowledge of the claim" within the meaning of N.Y. U.C.C. § 8–304(3). In this regard, Toxey doubtless learned less than Bassett and Johnson had learned about the claim. Thus Bassett and Johnson surely had "knowledge of the claim." On the other hand, what Toxey had learned may not have amounted to "knowledge of the claim," but surely did suffice to give him knowledge of "facts which should have aroused [his] suspicion. . . ." *Gutenkunst, supra,* 486 F.2d at 196.

16. This fact makes the case similar to *Otten v. Marasco, supra,* wherein the court held that defendant should have investigated whether the agent was authorized to pledge the securities involved therein. 353 F.2d at 566.

17. Defendant advances two main arguments against this conclusion.

Defendant's first argument is that the "forgotten notice doctrine" of *Graham v. White-Phillips Co., Inc.,* 296 U.S. 27, 56 S.Ct. 21, 80 L.Ed. 20 (1935), applies herein and that application of that doctrine results in a conclusion that

## IV

### Damages

#### A. Conversion Measure of Damages

■ On the issue of damages, plaintiffs contend that they are entitled to a sum equal to the highest value that the American stock attained during a reasonable period following plaintiffs' discovery of the alleged conversion of such stock by Citibank. As a basis for their contention, plaintiffs correctly point out that "a person whose stocks have been converted is entitled to a reasonable time after notice of the conversion within which to determine whether he will purchase other stocks in the place thereof and that he may use as a basis for his claim of damages resulting from the conversion the highest prices which have prevailed during such reasonable period." *Mayer v. Monzo*, 221 N.Y. 442, 446–47, 117 N.E. 948, 950 (1917). However, plaintiffs' proffered measure of damages is based upon a construction of the U.C.C. that I am unable to accept.

■ Although plaintiffs are correct in observing that under Section 8–301(1) of the U.C.C., Citibank can have no greater rights in an investment security than its transferor had, plaintiffs' further contention that by purchasing from converters [18] Citibank itself became subject to the con-

version measure of damages is based on a misreading of the statute. Section 8–301 provides that "[u]pon delivery of a security the purchaser acquires *the rights* in the security which his transferor had . . .." N.Y.U.C.C. § 8–301(1) (emphasis added). That section of the statute does *not* provide that the purchaser assumes the *obligations* or *liabilities* of the transferor. Thus even if Bassett and Johnson were converters and, as such, subject to liability on the basis of the conversion measure of damages stated in *Mayer v. Monzo, supra,* it does not follow from Section 8–301 that upon accepting Bassett's and Johnson's pledge, Citibank became a converter and, as such, subject to liability on the basis of the conversion measure of damages.

Moreover, even if I accepted plaintiffs' reading of Section 8–301(1) or even if I found, on the basis of other authority, that Citibank was technically a converter, I would be very reluctant, given the facts herein, to apply the conversion measure of damages. That measure is one that has been designed, in large part, to deter certain overtly tortious conduct. The cases plaintiffs cite in support of an application of the conversion measure of damages are cases that involve wrongdoing of a more overt and active nature than the wrongdo-

defendant is a BFP because defendant did not have knowledge at the time of the disputed pledge transaction. There are two problems with this argument. First, the doctrine may not apply with full force in a case such as this, where the finding of notice rests on a finding of bad faith, which in turn rests in large part on a finding of disregard of suspicious circumstances. *See Graham, supra,* 296 U.S. at 32, 56 S.Ct. 21 (doctrine stated in relation to "actual notice" which is forgotten). Second, as stated by Judge Tyler in the instant case in his Memorandum of November 6, 1974, denying defendant's motion for summary judgment, the doctrine should not be applied rigidly to all commercial transactions in New York and "might be applied more readily to cases dealing with negotiable bonds . . . or promissory notes . . . than here, where the pledge involved untraded, unlisted control stock for which a greater duty of inquiry might be required. . . ." Memorandum of November 6, 1974 at 9. In light of these considerations, I find defendant's first argument unconvincing.

Defendant's second argument is based on the rule that a breach of the duty to inquire will create liability only if inquiry could have revealed what would have deterred the inquirer from doing what he did. Defendants urge that application of that rule herein results in a conclusion of no liability because inquiry by Citibank would have been futile.

Defendant's statement of the rule is correct. *See Kintslinger v. Manufacturers Trust Co.,* 280 App.Div. 729, 117 N.Y.S.2d 147, 151 (1st Dep't 1952). However, application of the rule does not exonerate defendants because inquiry of the Federal Reserve Bank of Atlanta would have fleshed out B.A. Bank's adverse claims and would have deterred Citibank from taking the pledge. Inquiry of Bussey would also have been useful since, by the date of the pledge, Bussey had left for Argentina and Costa Rica under questionable circumstances.

18. It should be noted that I have not found it necessary to decide whether Bassett and Johnson were in fact converters.

ing that is involved herein. *Mayer v. Monzo, supra*, and *Gelb v. Zimet Bros.*, 34 Misc.2d 401, 228 N.Y.S.2d 111 (Sup.Ct.N.Y. Co.1962), *aff'd mem.*, 18 App.Div.2d 967, 237 N.Y.S.2d 989 (1st Dep't 1963), involved stockbrokers who had wrongfully sold stock owned by their clients. Similarly, *Upson v. Otis*, 155 F.2d 606 (2d Cir. 1946), involved corporate directors who had used corporate money to buy stock that the corporation owned and who had thereby engaged in a flagrant violation of fiduciary duty.

Application of the conversion measure of damages may be appropriate in cases like *Mayer, Gelb*, and *Upson.* But application of that measure is not appropriate in this case.

### B. *Constructive Trust Theory of Damages*

The constructive trust theory of damages, presented by plaintiffs as an alternative to the conversion theory, is a more appropriate measure of damages in this case.

█ By wrongfully obtaining possession of the American Bank stock owned by the B.A. Bank, Bussey *et al.* engaged in an abuse of their fiduciary duty to the B.A. Bank. This abuse of duty warranted the imposition of a constructive trust upon the American Bank stock in favor of the B.A. Bank and the B.A. Bank's successors in interest, plaintiffs herein. *Garner v. Pearson*, 374 F.Supp. 580, 586 (M.D.Fla.1973) (action by instant plaintiffs against Bussey *et al.* and Bassett and Johnson); V A. Scott, *The Law of Trusts* § 495 (3d ed. 1967).

Bussey *et al.* transferred the American Bank stock to Bassett and Johnson, who in turn transferred the stock to Citibank. Bassett and Johnson and Citibank were not BFP's of the transferred stock. Thus the constructive trust in favor of the B.A. Bank followed the American Bank stock into the hands of Bassett and Johnson, *Garner v. Pearson, supra*, 374 F.Supp. at 586, and eventually into the hands of Citibank. *Cf. id.* According to Professor Scott,

Where the wrongdoer acquires title to property by fraud, duress or undue influence, he may transfer the property to a third person. If the third person has notice of the wrong or does not pay value, he holds the property subject to the constructive trust for the person wronged. If the third person is a bona fide purchaser, however, he can hold the property free of trust.

V A. Scott, *op. cit.*, § 468.

Citibank had notice of the adverse claim to the American Bank stock, *see supra*, and thus may be held to have had "notice of the wrong" for the purpose of the application of this principle. Of the 90,213 shares of American Bank stock that Citibank accepted in pledge, 86,874 shares were shares originally owned by B.A. Bank. Thus, 86,874 of the pledged shares were subject to a constructive trust in favor of the B.A. Bank.

█ Citibank is no longer in possession of any of the American Bank stock, which Citibank has exchanged for 110,060 shares of stock in the Southeast Bank. The constructive trust that would have been imposed upon the 86,874 shares of American Bank stock may be imposed on the appropriate number of Southeast shares now in the possession of Citibank because a constructive trust extends to the identifiable proceeds of the initial trust assets. *Id.*, § 507.

█ In lieu of the imposition of a constructive trust on the relevant number of Southeast shares, plaintiffs are entitled to a payment of damages equal to the value of the relevant number of Southeast shares on an appropriate date. *See* IV A. Scott, *op. cit.* § 291.2 ("If a trustee in breach of trust transfers trust property to a person who takes with notice of breach of trust, and the transferee has disposed of the property, the beneficiary can charge him with the value of the property.") (footnote omitted).[19] The relevant number of Southeast

19. Three points must be noted here. First, the section cited from Scott actually supports a payment of damages equal to the value of the relevant number of American Bank shares, *i. e.*, the "trust property." However, the American Bank shares, which were not publicly traded,

shares is 105,988, *i. e.*, 96.3% of the 110,060 shares of Southeast stock that were exchanged for the 90,213 shares of American Bank stock.[20]

For the purposes of measuring damages herein, an appropriate date for the valuation of that number of shares is the date on which the American Bank shares were exchanged by Citibank for the Southeast shares. *See* IV A. Scott, *op. cit.* § 291.2. That exchange occurred during August of 1973. During that month, the market value of the relevant number of Southeast shares fluctuated between $3,418,113.00 and $3,683,083.00. I find that plaintiffs should be awarded damages in the lesser of these two amounts.[21]

Thus plaintiffs are entitled to judgment in the sum of $3,418,113.00 plus interest from August 31, 1973. *See id.*

Enter judgment accordingly.

can, in the circumstances of this case, be valued only by reference to the value of the Southeast shares, which were publicly traded and for which the American Bank shares held by Citibank were exchanged. Second, the section cited from Scott requires that the transferee have "notice of the breach of trust" in order for the principle stated by Scott to apply. Here, I find that Citibank's notice of the adverse claim suffices to support an inference that Citibank had "notice of the breach of trust." *See* text, *supra*. Third, the section cited from Scott is a part of Scott's discussion of express trusts, not constructive trusts. However, I find the concepts involved in the law of express trusts and the law of constructive trusts sufficiently similar to warrant the application of this principle in this case.

As to the second and third points noted above, I note further that I reached my conclusions on those points in the absence of any alternatives suggested by defendant, which chose to submit only the scantiest of briefs on the damages issue.

20. The figure of 96.3% is derived from the fact that the 86,874 shares of American stock, to which plaintiffs lay claim, constitute 96.3% of the 90,213 shares of American Bank stock that Citibank took in pledge.

21. This finding is based on the fact that plaintiffs' principal claim is to the value of 86,874 shares of American stock, the exact value of which is difficult to assess. In light of the problems of valuation involved in the instant case, I find it appropriate to award plaintiffs the lesser of the relevant amounts.